# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF CONNECTICUT

ANTHONY NWACHUKWU,

                Plaintiff,

v.

     Case No. 3:16-cv-00704 (CSH)

LIBERTY BANK,

            Defendant

     **JULY 5, 2017**

## RULING ON PLAINTIFF'S MOTION FOR LEAVE TO FILE
## SECOND AMENDED COMPLAINT

HAIGHT, Senior District Judge:

       This case is before the Court on Plaintiff's motion (Doc. 31) for an order of the Court granting Plaintiff leave to file a Second Amended Complaint against Defendant in the form attached to the motion papers. Plaintiff's motion to amend is made under Rule 15(a) of the Federal Rules of Civil Procedure. Defendant resists this motion to amend and reiterates an earlier contention that Plaintiff's initial complaint should be dismissed. *See* Docs. 20, 32. This Ruling resolves Plaintiff's motion to amend his complaint.

# I.  INTRODUCTION

In January and June, 2013, Plaintiff Anthony Nwachukwu opened three personal deposit and checking accounts with Defendant Liberty Bank ("Liberty" or "the Bank").  In April 2016, an officer of the Bank advised Plaintiff that the Bank was closing his accounts.  Plaintiff objected to the closing, but could not prevent it, and on May 6, 2016 instructed Liberty to wire his funds to the Bank of New York Mullen, which was done.

On May 9, 2016, Plaintiff filed his initial complaint (Doc. 4) in this Court against Liberty. The case is based on the premise that the Bank's conduct in closing Plaintiff's accounts violated his legal rights.  Plaintiff coupled his complaint with a motion for a temporary restraining order and preliminary injunction (Doc. 1).  The Court denied all preliminary relief in an oral ruling from the bench after a hearing on May 16.  *See* Minute Entry, Doc. 16; Transcript, Doc. 17.

There ensued some occasionally disjointed activities addressed to the filings, which need not be recounted in detail.  It is sufficient for present purposes to say that Plaintiff, having previously availed himself of the ability to amend his complaint once as of right, is now required, by Defendant's forcefully expressed refusal of consent, to apply to the Court for leave to file a second amended complaint.  That application forms the subject matter of the present motion, which this Ruling decides.

The proposed Second Amended Complaint ("SAC") contains nine counts.  They all arise out of the same nexus of fact: The closing by the Bank, in April 2016, of Plaintiff's accounts, against Plaintiff's will and in disregard of his protest.  The nine counts may be summarized as follows:

  *  First Count:      breach of contract.

  *  Second Count:  breach of implied duty of good faith and fair dealing

&ast; Third Count:     negligent infliction of emotional distress.

&ast; Fourth Count:   intentional infliction of emotional distress.

&ast; Fifth Count:     violation of Connecticut Unfair Trade Practices Act.

&ast; Sixth Count:    violation of 42 U.S.C. § 1981.

&ast; Seventh Count: violation of 42 U.S.C. § 1982.

&ast; Eighth Count:   violation of 42 U.S.C. § 1983.

&ast; Tenth Count:    violation of the OCC of the U.S. Department of the Treasury.[1]

The Second Amended Complaint groups the First through Fifth Counts under the caption "State Claims." The remaining Counts are grouped under the caption "Federal Claims – Civil Rights Violations." Plaintiff's present motion, opposed by Defendant in its entirety, seeks a Court order granting Plaintiff leave to file an amended complaint asserting those claims in that order.

## II.  STANDARD FOR GRANTING LEAVE TO AMEND THE COMPLAINT

In cases like the one at bar, where a party is not entitled to amend its pleading as of right, Rule 15(a)(2) provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).

The leading case on the propriety of amendment of pleadings by leave of court is *Foman v. Davis*, 371 U.S. 178 (1962).  The Supreme Court stated generally that "the purpose of pleading is to facilitate a proper decision on the merits." 371 U.S. at 182 (citing and quoting *Conley v. Gibson*, 355 U.S. 41, 48 (1957)).  *Foman* then voices this oft-quoted guidance:

In the absence of any apparent or declared reason – such as undue

---

[1]  I have followed in text the numbering in the SAC, which contains no "Ninth Count."

> delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. – the leave sought [to amend] should, as the rules require, be "freely given."

371 U.S. at 182.

Instructed by *Foman,* federal trial courts are lenient in allowing amendments to pleadings, but they are not supine. If the party opposing amendment demonstrates the presence of one or more of the negative factors listed in *Foman*, the amendment will not be allowed, for in that circumstance the cause of justice would not be served.

In the following Parts of this Ruling, I will consider whether any of the "apparent or declared reasons" for refusing amendment articulated in *Foman* are present in this case. The final and most extended discussion relates to the last preclusive circumstance *Foman* enumerates: the "futility of amendment." The other *Foman* factors require less analysis.

### III. FACTORS RELEVANT TO REFUSING LEAVE TO AMEND

#### A. Undue Delay, Undue Prejudice

While undue delay in bringing a motion to amend is one of the factors, as enumerated by *Foman*, to consider in determining whether leave to amend will be extended, "[m]ere delay, . . . absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981). *See also Middle Atl. Utils. Co. v. S. M. W. Dev. Corp.,* 392 F.2d 380, 384 (2d Cir. 1968) ("The three-year delay . . . is an inadequate basis for denying a motion to amend. It may be a factor to be considered but unless the motion either was made in bad faith or will prejudice defendant, delay by itself is not enough to deny the requisite relief"). The party opposing amendment must show it has been

prejudiced by its adversary's delay in seeking leave. In this Circuit,

> In determining what constitutes "prejudice," we consider whether the assertion of the new claim would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction.

*Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993).

In the case at bar, Plaintiff's present motion to amend his complaint is not preceded by significant delay. The first motion to amend (Doc. 19) was filed on May 27, 2016. After some procedural uncertainties, the present motion to amend was filed on July 29, 2016. That is not an inordinate interval of time. The timing of this motion for leave to file a Second Amended Complaint does not present any of the significant measures of prejudice to Defendant enumerated by *Block* as reasons to disallow amendment. There has been no showing by Defendant that the new complaint will require it to expend significant additional resources, nor that the amendment will cause significant delay. (Indeed, the proposed Second Amended Complaint has only nine counts to the First Amended Complaint's ten.) Accordingly, the Court is satisfied that neither undue delay nor undue prejudice to the opposing party provides a viable ground upon which to deny this motion for leave to amend.

### B. Bad Faith, Dilatory Motive, Repeated Failure to Cure

Plaintiff has made two prior inadequate attempts to put forward this amendment, and the Court's denial of the first attempt gave Plaintiff's counsel ample notice of the Rule 15(a) standard to be met. *See* Doc. 25, at 2. Plaintiff's counsel, nonetheless, made a second, more egregious error in the second effort to amend, by misstating and mis-characterizing Rule 15(a). *See* Memorandum of Law in Support of Plaintiff's Second Amended Complaint, Doc. 29-2 at 2; Doc. 30. However, the

Court takes Plaintiff's counsel at his word when he says, on the second page of his latest memorandum of law, that regarding his mistake of law, "there was no intent at 'slight-of-hand' or any attempt to disregard the rule." Doc. 31-1 at 2 n.1.

This is not a case like *Denny v. Barber*, 576 F.2d 465 (2d Cir. 1978), where the district judge, in dismissing the initial complaint, put plaintiff on notice as to the defects of his complaint, and plaintiff sought leave to file a second amended complaint after a first amended complaint that had likewise been dismissed. In the case at bar, Plaintiff does, as discussed *infra*, state claims meeting the federal pleading standard, and has made prompt attempts to cure the defects in his motions. Accordingly, the Court fails to find any bad faith or dilatory motive on the part of this Plaintiff in proffering this second amended complaint, and regards Plaintiff's isolated prior curative failure an insufficient ground on which to deny the instant motion for leave to amend.

### C.     Futility

#### 1.     *Preliminary Considerations*

Although, under ordinary circumstances, leave to amend must be freely given, denial is proper where the proposed amendment would be "futile." *Foman*, 371 U.S. at 182. An amendment is considered "futile" if the amended pleading fails to state a claim, or would be subject to a successful motion to dismiss on some other basis. *See, e.g.*, *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) ("An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)"); *Donovan v. Am. Skandia Life Assur. Corp.*, 217 F.R.D. 325, 325 (S.D.N.Y. 2003) ("Where a proposed amended complaint cannot itself survive a motion to dismiss, leave to amend would be futile and may clearly be denied"), *aff'd*, 96 F. App'x 779 (2d Cir. 2004), *cert. denied sub nom Hendrickson v. Am. Skandia Life Assur. Corp.*, 543 U.S. 1146 (2005); *Bentley v. Greensky Trade Credit, LLC*, 156 F. Supp. 3d 274, 283 (D. Conn.

2015), *reconsideration denied sub nom. Bentley v. Tri-State of Branford, LLC*, No. 3-cv-141157, 2016 WL 2626805 (D. Conn. May 6, 2016).

It is therefore appropriate for the Court to consider which, if any, of the claims alleged in the Second Amended Complaint would survive a motion to dismiss under Rule 12(b)(6), if that pleading were to be filed. Because an amended claim's futility under Rule 15(a) depends upon whether it would be dismissed under Rule 12(b)(6), we ask of each claim Plaintiff that alleges in the SAC: Is this a claim upon which relief can be granted? – that being the touchstone of a motion to dismiss under Rule 12(b)(6). If a particular count in the proposed SAC does not state a claim upon which relief can be granted, the Court will not grant Plaintiff leave to amend his complaint to include that claim.

While the following discussion of futility considers the nine pleaded counts *seriatim* for the most part, particular emphasis will be laid upon the later claims grouped in the SAC under the caption "Federal Claims." I do so because the original subject matter jurisdiction of this federal district court depends upon the presence of a justiciable federal question under 28 U.S.C. § 1331. This would not appear to be a case where subject matter jurisdiction may be derived from diversity of citizenship under § 1332.[2] If the proposed SAC were filed, and it should become apparent that Plaintiff asserted no viable federal claims, the Court would dismiss the entire case, the federal claims with prejudice, and the state claims without prejudice to assertion in a state court, the latter for the

---

[2]  The Second Amended Complaint alleges in ¶ 1 that Plaintiff "is a Connecticut resident" who has "resided in the Farmington Valley (Avon) for over twenty years." ¶ 2 alleges that Defendant Liberty Bank has "fifty branches in the State of Connecticut" and "its headquarters in Middletown, Connecticut." These allegations are inadequate as a matter of law to establish the *citizenship* of either party, upon which diversity jurisdiction depends, but this Ruling reasonably infers that both Plaintiff and the Bank are citizens of Connecticut, so that diversity jurisdiction is lacking.

reason that I would decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367 over the state claims. If, on the other hand, it should appear that the SAC contains at least one viable federal claim, I would exercise supplemental jurisdiction over the state claims. The question would then become, for Rule 15(a) purposes, whether each state claim survives Rule 12(b)(6) analysis. There is no point reaching that later stage unless at least one federal claim states a claim upon which relief can be granted, and in consequence cannot be discarded as futile, thereby establishing this Court's subject matter jurisdiction.

### 2. *Manifestly Futile Claims*

A detailed analysis of the futility of each count is not necessary. It is immediately apparent that the Eighth Count of the SAC does not and cannot state a claim.

The count is captioned "Violation of 42 U.S.C. § 1983." Plaintiff's theory, as alleged in ¶ 69, is that the Bank's conduct in closing Plaintiff's accounts denied to Plaintiff "known constitutional rights to be free of discrimination and to equal treatment as do white people and those not of Nigerian descent, all in violation of 42 U.S.C. § 1983." There is no such thing as a "violation of 42 U.S.C. § 1983."

> Section 1983 provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States. Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere.

*Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citations omitted). "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal quotation marks omitted) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). In the case at bar, the federal rights Plaintiff

invokes are conferred by 42 U.S.C. §§ 1981 and 1982, pleaded in the Sixth and Seventh Counts respectively. No independent or separate claim lies under § 1983.

In any event, Plaintiff could not utilize § 1983 as a vehicle for his claims against Liberty Bank because that section furnishes a means of redress only with respect to the conduct of those who act "under color of state law" – individuals who are, in case law vernacular, "state actors." Absent that element, no claim lies under § 1983. *See, e.g., Hollander v. Copacabana Nightclub*, 624 F.3d 30, 33 (2d Cir. 2010) ("To assert a Section 1983 claim, Den Hollander must plead that the Nightclubs' conduct was done under the color of state law. State action occurs where the challenged action is fairly attributable to the state" (citations and internal quotation marks omitted)). The closing of Plaintiff's accounts was the conduct of Liberty Bank, a private entity. Plaintiff does not allege, and no discernible basis exits for believing, that the Bank's action was fairly attributable to the State of Connecticut.

Given these deficiencies, the Eighth Count in the SAC could not survive a motion to dismiss it. Consequently, the Court will not grant leave to include that count in an amended complaint

Comparable deficiencies exist with respect to the Tenth Count of the SAC, in which Plaintiff alleges at ¶ 63 that Defendant Liberty Bank "is a member of the OCC of the US Department of the Treasury, and as such is required to give fair access and equal treatment to its customers and to comply with all consumer laws and regulations." Plaintiff's theory is that Liberty Bank violated the OCC.

That claim was included in an earlier version of the complaint, which the Bank moved to dismiss (Doc. 20). The Bank's brief in support of that motion (Doc. 21), at 7-8, argued with respect to the OCC claim that "the Office of the Comptroller of Currency ('OCC') is a [U.S.] government agency"; Plaintiff had cited to no authority enabling the Court to substantiate the claim or grant any

relief to Plaintiff; and "Liberty is a state-chartered mutual bank, not regulated by the OCC, and therefore no cognizable legal theory exists in respect to this Tenth Claim." There have been subsequent exchanges of briefs of counsel, but Plaintiff has never quarreled with Defendant's dismissive arguments concerning the OCC claim, or cited any authority in support of that claim. The OCC claim may fairly be regarded as abandoned by Plaintiff. In any event it has no merit in law, and leave will not be granted to include the Tenth Count in an amended complaint.

### 3.  *Standard of Review on Futility of Claims*

As noted *supra*, leave to amend a pleading under Rule 15(a) will be denied if a claim sought to be added by amendment would be dismissed under Fed. R. Civ. P. 12(b)(6).

Rule 12(b)(6) allows defendants to assert by motion the defense of a plaintiff's "failure to state a claim upon which relief can be granted." In analyzing whether a plaintiff states a claim upon which relief can be granted, a court must accept as true all facts alleged in the complaint. *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). Claims set forth by the plaintiff in the complaint must be facially plausible. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A reviewing court need not credit "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action supported by mere conclusory statements." *Id.* To survive a motion to dismiss, a complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Instead, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face," which is to say, facts sufficient to "nudge[] their claims across the line from conceivable to plausible." *Id*. at 570.

10

In the case at bar, a claim Plaintiff asserts in his proposed Second Amended Complaint that does not meet those standards would not survive a motion to dismiss the claim under Rule 12(b)(6). Accordingly, to that extent the Court will not allow the amendment, since to do so would be futile.

Before considering the Plaintiff's claims *seriatim*, it is necessary to add some qualifying comments with respect to the pleading and proof of two of those claims: the Sixth Count and the Seventh Count. In the Sixth Count, Plaintiff alleges that Liberty Bank's conduct in closing his accounts violated 42 U.S.C. § 1981. The Seventh Count alleges that the same conduct violated 42 U.S.C. § 1982. §§ 1981 and 1982 are codifications of what, in their original forms, were parts of the Civil Rights Act of 1866, enacted by Congress in the immediate aftermath of the Civil War to prohibit racial discrimination in specified areas of human endeavor. This historical background is recited by the Supreme Court in *Runyon v. Fairfax-Brewster School, Inc.*, 427 U.S. 160, 167-74 (1976).

The Civil Rights Act of 1964 included, in Title VII, prohibitions against discrimination in various aspects of employment. Title VII has been a fertile ground of federal litigation. Beginning with *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and in a line of subsequent cases,[3] the Supreme Court fashioned a protocol for the pleading and proof of a Title VII employment discrimination claim. This is the now familiar *McDonnell Douglas* framework which the Second Circuit summarized recently in *Littlejohn v. City of New York*, 795 F.3d 297 (2d Cir. 2015). An employment discrimination plaintiff establishes a prima facie case if the plaintiff can show that he or she is a member of a protected class; was qualified for employment in the position in question;

---

[3] *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000).

suffered an adverse employment action; and there is "some minimal evidence suggesting an inference that the employer acted with discriminatory motivation." *Littlejohn*, 795 F.3d at 307 (citing Supreme Court decisions). Those showings, if made, raise a temporary presumption of discriminatory motivation, which shifts the burden of production to the employer to come forward with a non-invidious justification for the adverse employment action. If the employer presents evidence for that justification, "joining issue on plaintiff's claim of discriminatory motivation," the presumption vanishes, and the burden shifts back to plaintiff, who must demonstrate that the employer's proffered reason was not the true, or in any event the sole, reason for the employment decision, a burden that "merges with plaintiff's ultimate burden of showing that the defendant intentionally discriminated against her." *Id*. at 307-08.

The *McDonnell Douglas* proof and burden-shifting framework is invariably applied in Title VII employment discrimination cases, the land of its birth, where *McDonnell Douglas* procedures in the district courts must be regarded as compulsory. However, the Second Circuit has made use of the framework in other contexts as well. In *Huntley v. Community School Board of Brooklyn, New York School District No. 14*, 543 F.2d 979 (2d Cir. 1976), an African American school principal challenged his termination as racially motivated, in violation of §§ 1981 and 1983, but did not assert a claim under Title VII. The Second Circuit applied *McDonnell Douglas*, reasoning that "[a]lthough *McDonnell* dealt with questions of the order and nature of proof in actions under the Civil Rights Act of 1964, by analogy the principles there enunciated are applicable here." 543 F.2d at 983 n.6 (citation omitted). In *Sorlucco v. New York City Police Department*, 888 F.2d 4 (2d Cir. 1989), the court of appeals said: "By analogy, the [*McDonnell Douglas*] analysis applies to claims under section 1983." 888 F.2d at 7. In *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 103 (2d Cir. 2001), the Second Circuit applied *McDonnell Douglas* burden-shifting to a § 1981 complaint brought by

African American and Asian American restaurant patrons. In *Back v. Hastings on Hudson Union Free School District*, 365 F.3d 107, 123 (2d Cir. 2004), the court applied *McDonnell Douglas* in a § 1983 employment discrimination case where there was no Title VII claim. In *Ruiz v. City of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010), the Second Circuit considered Title VII, § 1981, and §1983 claims together, and applied the *McDonnell Douglas* framework to all of them.

In *Littlejohn*, 795 F.3d 297, an employment case where the plaintiff employee coupled a Title VII claim with claims under 42 U.S.C. §§ 1981 and 1983, the Second Circuit said, at 312: "Littlejohn's disparate treatment claim under Title VII, § 1981, and § 1983 is subject to the burden-shifting evidentiary framework set forth in *McDonnell Douglas.*" Judge Droney's opinion cited *Ruiz* for that inclusive proposition. *Id.*

Equally instructive is the Second Circuit's most recent decision on the point: *Doe v. Columbia University*, 831 F.3d 46 (2d Cir. 2016). The plaintiff in *Doe,* a male student at the defendant university, claimed that the university acted with sex bias in investigating and suspending him for alleged sexual assault, in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* No employment claims were involved. The district court dismissed Doe's action under Rule 12(b)(6). The Second Circuit reversed. Judge Leval's opinion poses the question as:

> whether the burden-shifting framework established by the *McDonnell Douglas* line of cases for claims of discrimination on account of race, religion, or national origin under Title VII, and the associated pleading burden we articulated in *Littlejohn*, apply also to Title IX claims alleging discrimination on account of sex in education programs or activities that receive federal support.

831 F.3d at 55. The Second Circuit answered that question in the affirmative. "These claims," it reasoned, "have so much in common that, at least on certain sorts of facts, that rules the Supreme

Court established for Title VII litigation appear to apply also to such similar claims of sex discrimination under Title IX." *Id.*

In *Doe*, the Second Circuit said that a pleading "is sufficient with respect to the element of discriminatory intent" if it "pleads specific facts that support a minimal plausible inference of such discrimination." *Id.* at 56. The *Doe* opinion's use of the adjective "plausible" reflects the clear import of reading *Littlejohn* and *Doe* together: on a motion to dismiss under Rule 12(b)(6), the criteria articulated in *Iqbal* apply to discrimination claims, which must also be evaluated in accordance with the *McDonnell Douglas* framework. The Second Circuit observed in *Doe* that "In *Littlejohn*, we clarified that *Iqbal* applies to employment-discrimination complaints brought under Title VII," with the practical effect that,

> at the 12(b)(6) stage of a Title VII suit, allegation of facts supporting a minimal plausible inference of discriminatory intent suffices as to this element of the claim because this entitles the plaintiff to the temporary presumption of *McDonnell Douglas* until the defendant furnishes its asserted reasons for its actions against the plaintiff.

831 F.3d at 54-55.

In the case at bar, Plaintiff Nwachukwu claims that Defendant Liberty Bank, in closing his accounts, discriminated against him because of his race and national origin. Those claims lie under 42 U.S.C. §§ 1981 and 1982, pleaded in the Sixth and Seventh Counts respectively. The evolving line of Second Circuit decisions establishes the rule in this Circuit that requires the combined application of the *McDonnell Douglas* framework and *Iqbal* pleading principles to any claim where discriminatory complaint is an element.[4] Under the cited Second Circuit cases, a district court

---

[4] In *Doe*, the Second Circuit said in a footnote: "Our court has extended the *McDonnell Douglas* burden-shifting framework to several other statutory schemes." 831 F.3d 56 n. 9. The court then cites several cases, including *Gant ex rel. Gant v. Wallingford Board of Education*, 195 F.3d 134, 146 (2d Cir. 1999), summarized as "applying the framework to racial

evaluating the legal sufficiency of a discrimination claim applies the *McDonnell Douglas* framework to the pleading and order of proof, and applies the *Iqbal-Twombly* criteria to the adequacy of a plaintiff's initial pleading.

I will follow that authority when I come to consider the futility *vel non* of Plaintiff's federal Sixth and Seventh Counts. They are preceded in the Second Amended Complaint by the state claims. I will now consider the state claims in order. However, discussion of *all* Plaintiff's claims in the SAC is preceded by a statement of Plaintiff's narrative of the case. That narrative forms the factual nexus for every claim Plaintiff asserts in his proposed amended pleading.

## IV.  PLAINTIFF'S NARRATIVE OF THE CASE

The theme pervading all nine counts in the amended complaint is that Liberty Bank's closing of Plaintiff's accounts was arbitrary, unfair, conducted in a deceptive manner, and the result of the Bank's discrimination against Plaintiff on account of his race and national origin.

Plaintiff's allegations with respect to the manner in which his accounts came to be closed appear in Count One of the SAC and are incorporated by reference throughout. In essence, Plaintiff's account is that on April 4, 2016, an unnamed bank employee telephoned Plaintiff unexpectedly. Plaintiff was not there to receive the call. The caller left a message, asking Plaintiff to return the call "so as to discuss his accounts at Liberty Bank." SAC ¶ 15.[5]

Plaintiff returned the Bank's call that day. A brief conversation ensued. Plaintiff speaks English with a pronounced accent. The bank employee asked him about his country of origin. Plaintiff responded that he was originally from Nigeria. In response to a further question by the

---

discrimination claims brought under 42 U.S.C. §§ 1981 and 1983."

[5]  The account in this Part is derived from ¶¶ 15-40 of the SAC.

bank employee about his employment, Plaintiff said that "he manages a payment platform." SAC ¶ 17. The short conversation thereupon ended. Plaintiff alleges that "[t]here was no legitimate banking purpose for the information sought by the banking official," since Plaintiff's "country of origin and line of work had nothing to do with the accounts held by him at Liberty Bank." ¶ 18.

Plaintiff's theory of the case is that on the basis of that single phone conversation, and in view of numerous publicized charges of fraudulent internet banking schemes concocted by Nigerians, those in charge of Liberty Bank decided they wanted nothing more to do with Plaintiff or his funds on deposit. On or about April 14, 2016, Plaintiff received a letter dated April 4 from a Liberty Bank vice president, Robin Fujio, stating that Plaintiff's accounts would be closed by April 29, 2016.

The reasons the Bank gave Plaintiff in its letter for closing his accounts had to do with difficulty in substantiating "the volume and dollar amounts credited to your personal accounts here," and "the nature of the business that you own," which involved obtaining "visas and passports." SAC ¶ 24. Ms. Fujio refused Plaintiff's requests to meet with her to discuss the matter. During a telephone conversation on April 29, 2016, Plaintiff alleges that Fujio said to him:

> I will not see you and your attorney and there is nothing you can do to change my mind. I will meet with you alone if you want to show me anything, but like I said, it will not change my mind. The accounts will be closed. We don't want money from your type.

SAC ¶ 30. The pleading stops short of saying that vice president Fujio "thereupon slammed down the phone," but the unpleasant tenor of this conversation is sufficiently conveyed without it.

During this conversation, Plaintiff complained to Fujio that the sudden and involuntary closing of his accounts at Liberty would cause him various sorts of hardship and inconvenience. The only concession Fujio would give was to postpone the closings by one week.

16

At all times between Plaintiff opening these accounts and the Bank closing them, Plaintiff maintained the accounts in good standing, complied with all Bank rules and practices, and paid all banking charges.

Plaintiff includes in his narrative a suggested motive for Liberty Bank's adverse behavior toward him. At that time, Plaintiff alleges, there was "a widely held belief among Americans, especially in the banking community that Nigerians are often involved in sham international banking schemes and illicit activities," with the results that "the FBI has actively investigated internet fraudulent banking schemes that allegedly originate in Nigeria" and "Nigerians have come under unfair scrutiny by the banking community in America based upon the illicit activities and banking shams of a relatively small group of Nigerians." SAC ¶¶ 19-21. In these circumstances, Plaintiff alleges in ¶ 22 "on information and belief" that:

> the Liberty Bank officers to whom Mr. Nwachukwu spoke, including the gentleman who for no known banking purpose asked him about his country of origin and First Vice President Robin Fujio, were aware of the widely held belief and unfairly unprejudiced belief that Nigerians were often involved in sham international banking schemes and illicit activities involving banking.

Plaintiff does not allege specifically that this awareness ascribed to Liberty Bank officers caused them to close his accounts, but that is the clear implication of the SAC read as a whole.

With the exception of the just quoted conclusory allegations about Bank officers' mental processes, Plaintiff's narrative is fashioned from well-pleaded factual allegations. *Iqbal* commands me to accept them as true. My responsibility on the present motion is to determine whether those facts, when viewed in the light of governing law, state plausible claims for relief. That is a "context-specific task" which, Justice Kennedy instructs us in *Iqbal*, "requires the reviewing court to draw on its judicial experience and common sense." 556 U.S. at 679. This Ruling draws upon those

virtues, to the extent that I possess them.

I turn to the remaining counts in the Second Amended Complaint, beginning with the state claims.

## V. STATE CLAIMS

### A.     Count One: Breach of Contract

In Connecticut, "[t]he elements of a breach of contract claim are [1] formation of an agreement, [2] performance by one party, [3] breach by the other party, and [4] damages." *Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 311 Conn. 282, 291 ( 2014) (quoting *Maloney v. Connecticut Orthopedics, P.C.,* 47 F.Supp. 244, 249 (D. Conn. 1999)).

As to the first element, Plaintiff satisfactorily alleges that he and Defendant formed an agreement at the time Plaintiff opened his bank accounts with Defendant. ¶ 35. Plaintiff also satisfactorily alleges his own performance, saying he "did not violate any terms of the agreement concerning his accounts . . . . The accounts were in good standing and the fees that were charged . . . were always paid." ¶ 36. As to the third element, Plaintiff's central claim of breach seems to be that Defendant failed to secure Plaintiff's accounts, following an inadequate "investigation." Taking all of Plaintiff's factual allegations as true, this is sufficient to satisfy the breach element of a breach of contract claim.

Where the breach of contract claim comes up short is in its failure to allege actual damages caused by the breach, as required by the fourth element.   In Connecticut, proof of damages is an essential element of a claim for common law breach of contract.  *Meyers,* 311 Conn. at 291.  "When damages are claimed they are an essential element of the plaintiff's proof and must be proved with reasonable certainty." *Leggett St. Ltd. P'ship v. Beacon Indus., Inc.*, 239 Conn. 284, 308-09 (Conn. 1996).  In the absence of such evidence of the amount of actual damages, "the plaintiff cannot

prevail" on a claim for breach of contract. *Bottaro v. D & D Heating and Air Conditioning*, No. TTDCV136006751S, 2015 WL 5626167, at *4 (Conn. Super. Ct. Aug.17, 2015).

In the present case, the only reference in the First Count, the breach of contract claim, that is even arguably relevant to damages appears in ¶ 41, where Plaintiff alleges: "The closure of the accounts if left the way it is will make other banks/financial institutions wary of the Plaintiff without reason." This language cannot be read as an assertion that such fiscal embarrassment has already been visited upon Plaintiff by some unnamed "other bank/financial institution." Rather, Plaintiff is speculating – the circumstances do not merit a stronger word – that this may happen to him in the future. Moreover, the speculation is implausible. Liberty Bank closed Plaintiff's accounts in April 2016. It is now June 2017, over a year later. If some other bank or institution had treated Plaintiff warily, negatively or adversely because Liberty Bank had previously closed his accounts, one would expect that the Court would have heard about it by now. The logical inference to draw is that Plaintiff has had no difficulty or awkwardness in his subsequent dealings with other banks.

Conceptually, it is possible under the Connecticut cases to include a future loss in compensable actual damages for a present breach of contract. But the nature, amount and likelihood of that future loss must be adequately proven. An illustrative case is *Wyatt Energy, Inc. v. Motiva Enterprises, LLC*, 128 Conn. App. 666 (Conn. Ap. Ct. 2011), where the owner of a port terminal entered into a contract with an oil refiner for the refiner's use of the terminal. The terminal owner breached the contract. The refiner included in its asserted damages, and succeeded upon, a claim that the terminal owner's breach deprived the refiner of future revenues under a separate contract between the refiner and its leading customer. During a bench trial, the trial court received proof from the refiner about the nature and profitability of its agreement with its customer, and the likelihood of the agreement being extended and the revenues continuing, but for the terminal

operator's breach.  The Connecticut Appellate Court, affirming the trial court's award of damages

on that claim, reasoned that the refiner's trial evidence

> proved to a reasonable certainty that Citgo would have remained a
> customer of Motiva at the Wyatt terminal throughout the life of the
> agreement.  Notwithstanding Wyatt's argument to the contrary, the
> court's memorandum of decision demonstrates that its award of
> damages was based not on mere speculation or assumptions, but on
> its evaluation of the evidence presented in support of Motiva's
> damages claim; evidence that afforded a basis for a reasonable
> estimate of Motiva's total damages as sustained by Wyatt's breach of
> the agreement.

128 Conn. App. at 687-88 (internal quotation marks omitted).

In contrast, Plaintiff's proposed amendment contains no allegations identifying banks or

institutions that might treat Plaintiff unfavorably in the future because of Liberty Bank's past

conduct, or how that hypothesized adverse treatment might damage Plaintiff.  Nor is there any

allegation that Plaintiff has been subjected to such indignities up to the present.  The Appellate Court

in *Wyatt Energy* held that the refiner's claim for lost future revenues was compensable as actual

damages for breach of contract because the claim was based on evidence, not "mere speculation or

assumptions."  Plaintiff's claim that Liberty Bank's breach of contract will damage him *in futuro* is

nothing but speculation or assumptions.  In short, Plaintiff's failure to plead any form of damages

is a concomitant failure to plead an essential element of this breach of contract claim.

In consequence, Plaintiff's proposed First Count does not state a viable claim under

Connecticut law for breach of contract.  The Court will not grant leave to amend the complaint so

as to include that claim.

## B.  Count Two: Breach of the Implied Covenant of Good Faith and Fair Dealing

Count Two of the SAC reincorporates the narrative allegations of the pleading, and alleges

in ¶ 42 that Liberty Bank "breached the doctrine of good faith and fair dealing that is implicit in all

business transactions."

"[I]t is axiomatic that the duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship." *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 432 (Conn. 2004). Stated otherwise, "every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Id*. To constitute a breach of the covenant of good faith and fair dealing, the violative conduct "must have been taken in bad faith." *Id.* at 433. "Bad faith" in this context is "not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. Bad faith means more than mere negligence; it involves a dishonest purpose." *Id*.

"Bad faith is usually proved circumstantially because it is usually, by definition, 'furtive,' and thus a plaintiff need not set forth a more specific or objective set of facts in the complaint in order to survive a motion to dismiss." *Singer v. Priceline Grp., Inc.*, No. 15-cv-1090 (VAB), 2016 WL 3976539, at *6 (D. Conn. July 22, 2016) (internal quotation marks omitted) (quoting *Antonacci v. Darwin Select Ins. Co.*, No. HHBCV085009088, 2009 WL 1424676, at *2 (Conn. Super. Ct. Apr. 27, 2009)).

In the case at bar, Plaintiff adequately pleads that the complained-of acts taken by Liberty Bank to impede his contractual rights (closure of his accounts with the Bank) were taken for an "interested or sinister motive." Plaintiff alleges that the Bank closed his accounts "for illegal discriminatory reasons based upon [Plaintiff's] race and national origin." SAC ¶ 39.

*Iqbal* held with respect to an allegation that defendants acted with discriminatory intent that "the Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context," and dismissed the action because "respondent's complaint fails to plead sufficient facts to state a claim for purposeful and unlawful discrimination against petitioners."

556 U.S. at 686-87.  In contrast, the Plaintiff at bar pleads suggestive facts.  He points out that the

Bank officers' decision to close his accounts was taken seemingly on the same day that the Bank's

employee inquired into Plaintiff's national origin and learned he was Nigerian, a circumstance

coupled with the Bank officer's subsequent dismissive statement to Plaintiff: "We don't want money

from your type."  ¶¶ 17, 23, 30. These allegations are sufficient to establish at the pleadings stage

a plausible claim that the Bank engaged in the "interested or sinister motive" of discrimination on

the basis of race or national origin.

Under Connecticut law, acting in bad faith is a necessary, but not sufficient, element of a

cognizable claim for breach of the implied covenant of good faith and fair dealing.  To recover for

breach of the covenant, a plaintiff must establish the requisite elements of a breach of contract claim.

*See Hirschfeld v. Machinist*, 151 Conn. App. 414 (Conn. Ap. Ct. 2014):

> It is well settled that a breach of the implied covenant of good faith
> and fair dealing is, in essence, a breach  of contract – and, therefore,
> subject to the general rules governing the law of contracts. . . .
>
> . . . [A] claim for breach of good faith and fair dealing is nothing
> more than a breach of contract claim and is analyzed like a claim for
> the breach of any other contractual duty.  The appropriate remedy for
> a breach of the implied covenant of good faith and fair dealing,
> therefore, is money damages.

Id. at 430-31 (Flynn, *J*., dissenting) (citation and internal quotation marks omitted).[6]    For the

reasons stated in the preceding section, Plaintiff does not allege a requisite element of a breach of

contract claim – actual damages.  That is fatal to a claim for breach of the covenant of good faith and

---

[6]    *Hirschfeld* was decided by a three-judge panel of the Connecticut Appellate Court,
which divided on whether the particular acts of the case constituted a breach of the good faith
covenant.  While Judge Flynn dissented on that issue, his expression of the general principles
quoted in text are accepted as declarative of Connecticut law on breach of the covenant.  *See,
e.g., Singer*, 2016 WL 3976539, at *7 (Bolden, *J*.) (citing and quoting Judge Flynn's dissent in
*Hirschfeld*).

fair dealing implied in the contract between the parties. The Connecticut cases' requirement, that a viable claim for breach of contract include demonstrable damages caused by the breach, is not abrogated by characterizing the offending conduct as a breach of the implied covenant.[7]

Further, Connecticut courts have adopted the view that a claim for breach of the implied covenant of good faith and fair dealing must be tied to an alleged breach of an express contract term. *See Geysen v. Securitas Sec. Servs. USA, Inc*., 322 Conn. 385, 399 (Conn. 2016); *Landry v. Spitz*, 102 Conn. App. 34, 47 (Conn. App. Ct. 2007). *See also Steiner v. Lewmar, Inc.*, No. 3:09 CV 1976 DJS, 2013 WL 5755578, at *5 (D. Conn. Oct. 22, 2013) (Squatrito, *J.*) (quoting *Landry*); *E. Point Sys., Inc. v. Maxim,* No. 3:13-CV-00215 VLB, 2014 WL 523632, at *4 (D. Conn. Feb. 7, 2014) (Bryant, *J.*) (same); *Larobina v. Wells Fargo Bank*, N.A., 3:10–cv1279(MRK), 2012 WL 1032953, at *4 (D. Conn. Mar. 27, 2012) (Kravitz, *J.*) (same). As discussed under Count One, Plaintiff has not stated a claim for breach of the contract's express terms.

Because Plaintiff has not pleaded factual allegations as to damages, leave will not be granted to amend the complaint to include a claim of breach of the implied covenant of good faith and fair

---

[7] "Connecticut courts have not been uniform as to whether a cause of action for the breach of good faith is properly characterized as an action in tort or an action on a contract." *Cornerstone Realty, Inc. v. Dresser Rand Co.*, 993 F. Supp. 107, 110 n. 2 (D. Conn. 1998) (Squatrito, *J.*) (collecting cases). While the Court is convinced that the latter approach is superior, and therefore considers the Second Count as sounding in contract, that election is not determinative. Were Count Two construed as a tort action, Plaintiff would need to plausibly plead the standard elements of a tort claim – duty, breach, causation, and injury. Count Two adequately pleads a duty (that created by the implied covenant of good faith and fair dealing) and a breach (Defendant's refusal to deal fairly with Plaintiff by refusing him an opportunity to be heard before closing his accounts.) But, just as Plaintiff's breach of contract claim under Count One lacks the requisite factual basis for establishing damages, Count Two, construed as a tort pleading, lacks any factual pleading as to injury and causation. In a breach of the implied covenant of good faith and fair dealing, the defendant's bad faith actions "injure the right of the other to receive the benefits of the agreement." *De La Concha*, 269 Conn. at 432. Plaintiff has not pleaded any facts as to which contract "benefits" he has not received, nor what harm this has caused him.

dealing.

**C.     Count Three: Negligent Infliction of Emotional Distress**
**        Count Four: Intentional Infliction of Emotional Distress**

Count One and Count Two sound in contract.  Connecticut law also establishes the tort of infliction of emotional distress.  More precisely, there are two related but separate torts: *intentional* and *negligent* infliction of emotional distress.  Plaintiff seeks leave to amend his complaint to plead both of them.

Typically a plaintiff pleads both infliction claims in the alternative, in the same complaint, against the same defendant, arising out of the same nexus of facts.  The case at bar follows that pattern.  Plaintiff alleges in the Third Count that Liberty Bank's conduct constitutes negligent infliction of emotional distress upon Plaintiff.  The Fourth Count alleges that the same conduct constitutes intentional infliction of that distress.

In *Carrol v. Allstate Insurance Company*, 262 Conn. 433 (Conn. 2003), the Connecticut Supreme Court had occasion to consider both causes of action together and reflect upon their similarities and differences.  The case arose out of property damage caused by a fire at the plaintiff's home.  Plaintiff's insurer, the defendant, denied coverage on the basis of its investigatory conclusion that the fire resulted from arson committed by plaintiff.  Plaintiff sued the insurer under the policy.  A jury trial established that the insurer's conclusion of arson was erroneous.

The jury  awarded plaintiff damages for intentional and negligent infliction of emotional distress, and breach of contract.  The finding of intentional infliction allowed an award of punitive damages against the insurer.  On appeal, the Connecticut Supreme Court reversed the judgment for intentional infliction of emotional distress and vacated the award of punitive damages.  The court affirmed the judgment for negligent infliction.  The court's reasoning for this divided result is

instructive in the case at bar. I consider these two claims, asserted by the present Plaintiff, in order.

1. ***Intentional Infliction of Emotional Distress***

As for the *intentional* infliction of emotional distress, the *Carrol* court summarized the

law of Connecticut in concise terms:

> In order for the plaintiff to prevail in a case for liability under intentional infliction of emotional distress, four elements must be established. It must be shown (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe.

> Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arose his resentment against the actor, and lead him to exclaim, Outrageous! Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress.

262 Conn. at 442-43 (footnote, citations, and internal quotation marks omitted).

Reverting to the case at bar, I conclude that the Plaintiff's narrative of events, even if accepted as entirely truthful, does not state a plausible claim for the intentional infliction of emotional distress under the demanding criteria of *Carrol*. On Plaintiff's own narrative and theory of the case, the Bank did not close his accounts because of some mysterious, purposeless, baseless, unfounded, excessive and outrageous intention to cause Plaintiff emotional distress. Rather, Plaintiff's theory is that as the result of real-world developments, Liberty Bank officers became wary of doing banking business with Nigerians, and closed Plaintiff's accounts immediately after Plaintiff

identified Nigeria as the land of his birth.  If one accepts that as the explanation for the Bank's conduct, one may (for the sake of argument) condemn the conduct as mistaken, unfair, unreasonable, mean-spirited, paranoid, illegal, nay, even unconstitutional.[8]  However, the Bank's acts do not rise to the level (or more appropriately, sink to the depths) "as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community," to quote again the state supreme court's powerful language in *Carrol*.

Indeed, the particular holding in *Carrol* militates against a conclusion in the present case that Liberty Bank's conduct was the stuff of which an action for intentional infliction of emotional distress may be made.  The court reasoned in *Carrol* that

> the evidence was not sufficient for a jury reasonably to conclude that the defendant's conduct in its fire investigation was extreme and outrageous.  The plaintiff produced evidence that the defendant did not conduct a thorough or reasoned investigation and may have decided too quickly that the fire had been set deliberately.  As distressing as this insurance investigation may have been to the plaintiff, however, it simply was not so atrocious as to trigger liability for *intentional* infliction of emotional distress.

262 Conn. at 443-44 (emphasis in original).

I reach the same conclusion with respect to Plaintiff's claim that the Bank's conduct triggers liability for intentional infliction.  That is the claim asserted in Count Four.  Leave will not be granted to amend the complaint to include that claim.

### 2.    *Negligent Infliction of Emotional Distress*

Turning now to Count Three, it asserts, on the same facts, a claim for the *negligent* infliction of emotional distress.  The nature and elements of that tort under Connecticut law were summarized

---

[8]  The Bank, if it acknowledged such motivation, would presumably defend it as prudent banking practice.

recently in *Leth v. Halloran & Sage,* LLP, No. HHDCV1660680189S, 2017 WL 1194321, at *7-8 (Conn. Super. Ct. Feb. 21, 2017):

> In *Montinieri v. Southern New England Telephone Co.*,175 Conn. 337 (Conn. 1978), our Supreme Court held that, in order to prevail on a claim of negligent infliction of emotional distress, the plaintiff must prove that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm. As further clarified by our appellate courts, to prevail on such a claim, a plaintiff must prove that the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress, the plaintiff's distress was foreseeable, the emotional distress was severe enough that it might result in illness or bodily harm, and, finally, that the defendant's conduct was the cause of the plaintiff's distress. The foreseeability requirement in a negligent infliction of emotional distress claim is more specific than the standard negligence requirement that an actor should have foreseen that his tortious conduct was likely to cause harm. In order to state a claim for negligent infliction of emotional distress, *the plaintiff must plead that the actor should have foreseen that her behavior would likely cause harm of a specific nature, i.e., emotional distress likely to lead to illness or bodily harm.* In negligent infliction of emotional distress claims, unlike general negligence claims, the foreseeability of *the precise nature of the harm to be anticipated is a prerequisite to recovery* even where a breach of duty might otherwise be found.

2017 WL 1194321, at *8 (emphases in original) (citations to other Connecticut Supreme Court cases and internal quotation marks omitted).

In *Barrett v. Danbury Hospital*, 232 Conn. 242 (Conn. 1995), the Connecticut Supreme Court reflected further on the distress a plaintiff might feel and the foreseeability of that distress by a defendant whose conduct caused plaintiff to feel it. The court said:

> This part of the *Montinieri* test essentially requires that the fear or distress experienced by the plaintiffs be reasonable in light of the conduct of the defendants. If such a fear were reasonable in light of the defendants' conduct, the defendants should have realized that their conduct related an unreasonable risk of causing distress, and they, therefore, properly would be held liable. Conversely, if the fear were unreasonable in light of the defendants' conduct, the defendants

> would not have recognized that their conduct could cause this distress
> and, therefore, they would not be liable.

232 Conn. at 261.

Connecticut law does not require that in order to state a claim for negligent infliction of emotional distress, a plaintiff's distress must have caused actual illness or bodily harm, so long as the defendant should have foreseen that his conduct might have that effect. In *Carrol,* the Connecticut Supreme Court reviewed its prior decisions and reiterated that "there is no logical reason for making a distinction, for purposes of liability, between those cases where the emotional distress results in bodily injury and those cases where there is emotional distress only. The only requirement is that the distress *might* result in illness or bodily harm." 262 Conn. 448 (emphasis in original) (citation an internal quotation marks omitted). The court allowed the *Carrol* plaintiff's judgment on his negligent infliction claim to stand because his proof at trial satisfied that less demanding element:

> [T]here was sufficient evidence that the plaintiff's distress was severe
> enough for the jury reasonably to conclude that the plaintiff's distress
> might result in illness or bodily harm. The only requirement is that
> the distress *might* result in illness or bodily harm. The plaintiff
> testified that he could not sleep, had frequent nightmares, had a loss
> of appetite, and experienced depression and a sense of isolation from
> his community because of the investigation.
>
> Finally, there was sufficient evidence from which the jury could
> find causation: The plaintiff testified that although the fire was
> upsetting, it was the defendant's investigation that was "devastating"
> and the cause of his emotional turmoil.

*Id.*

Plaintiff Nwachukwu's account in the SAC on this aspect of the case is limited to allegations appearing in ¶ 32 of the First Count (breach of contract) and ¶¶ 46-47 of the Third Count (negligent infliction of emotional distress). According to ¶ 32, Plaintiff told Bank vice president Fujio on the

telephone that

> the closure of his personal accounts would set a bad precedent and he risks being unbankable since he was not given a proper foundation or any banking related grounds for his being terminated. He mentioned to her that he was late on paying his bills, taxes and school fees for his children, because of the directives she gave in her letter. He did not want to write checks on the accounts that she had promised to close. He asked her for accommodations given his circumstances, but she refused.

¶ 46 alleges that "when the Plaintiff finally spoke with Ms. Fujio, he told her about the high level of distress that her letter had placed on him, thereby affecting his family." ¶ 47 alleges: "Defendant's conduct in closing the Plaintiff's accounts caused emotional distress to the Plaintiff and said distress resulted in illness to the Plaintiff."

In the case at bar, even if those allegations are accepted as true, the cited holdings by the Connecticut Supreme Court compel the conclusion that Plaintiff fails to allege a plausible claim for negligent infliction of emotional distress. Specifically, Plaintiff fails to assert facts sufficient to establish that Liberty Bank should have anticipated that closing Plaintiff's bank accounts would create in their erstwhile depositor an emotional distress so severe that it might result in Plaintiff suffering illness or bodily harm.

I accept that when Liberty abruptly closed his accounts, Plaintiff felt irritation, coupled with the anxiety and uncertainty he described to Fujio in their telephone conversation about the checks he needed to write to creditors. There was no need for the Bank officers to foresee that reaction on the part of Plaintiff, Nwachukwu having forcibly expressed it to Fujio in an unsuccessful effort to keep his accounts open. But those circumstances do not support a claim against the Bank for negligent infliction of emotional distress. As the cited Connecticut cases hold, in order to state a claim for negligent infliction of emotional distress, Plaintiff must plead and prove that the Bank

officers foresaw, or should have foreseen, that if the Bank closed Plaintiff's accounts, Plaintiff would suffer emotional distress of a severity likely to lead to his illness or bodily harm. The specific question posed by this motion is whether Plaintiff's proposed Second Amended Complaint pleads a claim with those particular circumstances that is plausible. He does not do so.

Accepting the truth of the factual allegations in the SAC, the Bank's notice of closing of accounts confronted Plaintiff with the necessity of making arrangements for "almost $100,000.00 from his accounts at Liberty Bank," SAC ¶ 34, a significant amount but not beyond the capabilities of the myriad banks in the tri-State area during the year 2016. It is reasonable to suppose that the Liberty Bank officers (to the extent they thought about it at all) foresaw that Plaintiff, an experienced businessman, would be able ability to retrieve his funds from Liberty and deposit them with another bank.[9] However, it is entirely fanciful to suppose that the Liberty officers foresaw or should have foreseen that their closing Plaintiff's accounts would plunge Plaintiff an emotional distress so severe "the distress might result in illness or bodily harm," to quote *Carrol* one more time. Some of Plaintiff's allegations seek to create that impression, but their transparent purpose is to recite the elements of a negligent infliction claim, an exercise in advocacy the Supreme Court explicitly rejected in *Twombly* and *Iqbal*. The claim Plaintiff pleads is wildly implausible. I reach that common-sense conclusion with the guidance of my own common sense, which Justice Kennedy directed me to employ in *Iqbal*.

For the foregoing reasons, Plaintiff's claim would not survive a motion to dismiss, and the Court will not grant Plaintiff leave to include that claim in an amended complaint.

**D.     Count Five:   CUTPA**

---

[9]   Indeed, there is nothing in the record to suggest that Plaintiff did not do precisely that.

The Fifth Count of the proposed Second Amended Complaint asserts a claim by Plaintiff against Defendant Liberty Bank under the Connecticut Unfair Trade Practices Act (CUTPA), Connecticut General Statutes § 42-110 *et seq.*

The Supreme Court of Connecticut has said that "CUTPA is, on its face, a remedial statute." *Marinos v. Poirot*, 308 Conn. 706, 712 (Conn. 2013). The Act's core provisions appear in General Statutes § 42-110b (a) and § 42-110g (a).

§ 42-110b (a) provides:

> No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

§ 42-110g (a) provides in part:

> Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action in the judicial district in which the plaintiff or defendant resides or has his principal place of business or is doing business, to recover actual damages.

The Supreme Court of Connecticut looked to these provisions when it defined, in *Artie's Auto Body, Inc. v. Hartford Fire Insurance Co.*, 287 Conn. 208 (Conn. 2008), the requisite elements of a viable CUTPA claim:

> To prevail on a CUTPA claim, the plaintiffs must prove that (1) the defendant engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce, General Statutes § 42-110b(a); and (2) each class member claiming entitlement to relief under CUTPA has suffered an ascertainable loss of money or property as a result of the defendant's acts or practices. General Statutes § 42-110g(a). The ascertainable loss requirement is a threshold barrier which limits the class of persons who may bring a CUTPA action seeking either actual damages or equitable relief . . . . Thus, to be entitled to any relief under CUTPA, a plaintiff must first prove that he has suffered an ascertainable loss due to a CUTPA violation.

287 Conn. at 217-18 (citation and internal quotation marks omitted).

The Connecticut cases make it plain that a plaintiff, in order to establish a viable CUTPA claim, must plead and prove both these elements: first, conduct by the defendant which violates the statute; and second, an ascertainable loss suffered by plaintiff caused by that conduct. A plaintiff may prove the first element, but it avails him nothing unless he also proves the second. A defendant's conduct of a trade or commerce *vis-a-vis* a particular plaintiff may be unfair or deceptive. That conduct, standing alone, does not give rise to CUTPA liability to that plaintiff, who must also prove that the defendant's violative conduct inflicted an ascertainable loss upon the plaintiff. The Second Circuit applied that principle in *Nationwide Mutual Insurance Co. v. Mortensen*, 606 F.3d 22 (2d Cir. 2010): "Even assuming that the alleged activities could constitute an unfair business practice, Nationwide points to no evidence that the agents' pre-termination actions caused them to lose customers. Because Nationwide has not satisfied this requirement, we affirm the district court's dismissal of this claim." 606 F.3d at 31(footnote omitted) (citing Connecticut cases).

In the case at bar, Plaintiff Nwachukwu's proposed Second Amended Complaint ("SAC") against Defendant Liberty Bank, examined under the prism of *Iqbal-Twombly* analysis, pleads a plausible claim with respect to the first of the two CUTPA elements. Plaintiff's narrative of the case, derived from well-pleaded factual allegations, is recited in Part IV of this Ruling, *supra*. In short, Plaintiff claims that the Bank's conduct violated the CUTPA statute when it acted arbitrarily, in an unfair and deceptive manner, and for racially motivated reasons, in closing Plaintiff's accounts.

Liberty Bank presumably disagrees with the factual accuracy of this account, and at a plenary trial Plaintiff would bear the burden proving it to the fact finder's satisfaction. However, on the present motion I must accept that these well-pleaded allegations are true. Moreover, they are

sufficient to state a plausible claim that the bank treated Plaintiff unfairly and deceptively, by eliciting his Nigerian antecedents for no stated banking reason or purpose, and then closing Plaintiff's seemingly legitimate and properly performing deposit accounts, seemingly on the basis that other persons of Nigerian backgrounds were said to have acted dishonorably. It is difficult to discern any other meaning in bank vice president Fujio's asserted parting shot that "we don't want money from your type." That is redolent of guilt, or at least vice, by association, with racial overtones.

I am bound to accept on this motion that Fujio explicitly conveyed that sentiment to Plaintiff, and it is difficult to conclude that her conduct would pass muster under the letter and spirit of CUTPA. To succeed on a claim under CUTPA, "[t]he practice attacked may be actually deceptive or a practice amounting to a violation of public policy." *Fabri v. United Techs. Int'l, Inc.* 387 F.3d 109, 120 (2d Cir. 2004). CUTPA claims "need not contain the elements of fraud," and so the Fifth Count need not satisfy the enhanced pleading requirements of Fed. R. Civ. P. Rule 9(b). *Tatum v. Oberg,* 650 F. Supp. 2d 185, 195 (D. Conn. 2009). According to Plaintiff's allegations, the bank decided to close these accounts as soon as its officers learned of Plaintiff's Nigerian background, and thereafter refused to give Plaintiff the opportunity to correct what Plaintiff says were inaccurate perceptions about his business. The plausibility of Plaintiff's description of the timing and motive of the bank's conduct is reinforced by the fact that the bank's letter advising of the accounts' closing, although apparently mailed later, is *dated* April 4, 2016, the same day on which a bank employee placed the telephone call to Plaintiff, inquired for no discernible banking reason about Plaintiff's country of origin, and obtained Plaintiff's presumably unsuspecting response that it was Nigeria. It is plausible to suggest – at this stage the proposition need not be put higher – that a commercial bank's involuntary closing of facially legitimate private accounts, for such a reason and in this

precipitate manner, offends public policy.

Where Plaintiff's invocation of CUTPA fails is in its total failure to allege a plausible claim that it can satisfy the second element, that Plaintiff suffered an ascertainable loss which Defendant's conduct caused.

In *Artie's Auto Body*, 287 Conn. 208, the Connecticut Supreme Court expanded on the concept of "ascertainable loss." The court said: "An 'ascertainable loss' is a loss that is capable of being discovered, observed or established," and added that a "plaintiff also must prove that the ascertainable loss was caused by, or 'a result of,' the prohibited act." 287 Conn. at 218 (quoting the Act) (citation and internal quotation marks ommitted).

The Connecticut Supreme Court decided *Artie's Auto Body* in the context of a class action. The case at bar is brought by an individual plaintiff, without any class implications, but that difference does not affect the requisite elements of a CUTPA claim, which are the same in all CUTPA cases. The court made that plain in its subsequent decision in *Marinos v. Poirot*, 308 Conn. 706 (Conn. 2013). Plaintiff Marinos, the widow of a law firm senior partner, filed an action against a junior partner alleging CUTPA violations arising out of defendant's alleged conversion and theft of the firm's clients, business and property. The trial court granted defendant summary judgment and dismissed the complaint, on the ground that the plaintiff had failed, in pleadings or proof, "to establish a genuine issue of material fact as to whether the plaintiff, either in her personal or representative capacity, had suffered 'any loss of money or property . . . .'" 308 Conn. at 710-11.

The Connecticut Supreme Court affirmed. It held that plaintiff had failed to satisfy the second CUTPA element. The court acknowledged that under its earlier decisions, "for purposes of [CUTPA] § 42-110g, an ascertainable loss is a deprivation, detriment or injury that is capable of being discovered, observed or established," and is "ascertainable if it is measurable even though the

precise amount of the loss is not known. Under CUTPA, there is no need to allege or prove the *amount* of the actual loss." 308 Conn. at 714 (emphasis in the original) (internal quotation marks omitted). But the court immediately added, "[o]f course, a plaintiff must marshal *some* evidence of ascertainable loss in support of her CUTPA allegations, and a failure to do so is indeed fatal to a CUTPA claim on summary judgment." *Id.* (emphasis in the original). The state trial court in *Marinos* granted defendant summary judgment because "the plaintiff had failed to identify *any* evidence in her opposition that she or [her late husband]'s estate had suffered any ascertainable loss." *Id*. at 712 (emphasis in original). The supreme court affirmed that judgment.

The Connecticut Supreme Court decided *Marinos* in the context of a defense motion for summary judgment. The case at bar is presented for decision in the context of plaintiff's motion for leave to amend his complaint under Rule 15. The decision in *Marinos* applies in the present context because the court there held that a CUTPA plaintiff's proof of an ascertainable loss caused by the defendant's statutory violation is an essential element of a CUTPA claim, failing which the claim must be dismissed. In the instant case, I am asked to allow Plaintiff to file a CUTPA claim against Liberty Bank. I may not grant that leave under Rule 15 if it would be futile to do so. Futility precluding amendment is demonstrated if the claim sought to be added by amendment would be vulnerable to a motion to dismiss. The question thus becomes whether the Fifth Count sufficiently alleges a plausible claim that the bank's conduct – closing Plaintiff's accounts – caused Plaintiff to suffer an ascertainable loss – an essential element of a CUTPA claim.

That question, upon which this aspect of Plaintiff's present motion to amend turns, must be answered in the negative because the sole allegation addressing the issue says only that "as a result" of the accounts' closing, "the Plaintiff suffered economic loss." The proposed pleading contains no allegations describing how the bank's conduct caused Plaintiff an "economic loss" or what the loss

consisted of. The Fifth Count is a striking example of a "threadbare recital of the elements of a cause of action supported by mere conclusory statements," of the sort *Iqbal* holds to be insufficient to state a claim.

*Iqbal-Twombly* "plausibility" analysis applies in determining whether a plaintiff has pleaded a viable CUTPA claim. In *Parola v. Citibank (South Dakota) N.A.,* 894 F. Supp. 2d 188 (D. Conn. 2012), an action by a student loan borrower against a bank which included a CUTPA claim, the district court granted the bank's Rule 12(b)(6) motion to dismiss the complaint. With respect to the CUTPA claim, Judge Bryant held that Plaintiff could not show that "she suffered an ascertainable loss" caused by the bank's complained-of conduct. 894 F. Supp. 2d at 206. Judge Bryant reasoned that the plaintiff "cannot demonstrate that this loss was proximately caused by [defendant]'s conduct as opposed to her own conduct . . . . Consequently, [plaintiff] failed to state *a plausible claim* for relief under CUTPA." *Id.* (emphasis added). The *Parola* opinion had previously summarized the holdings of *Iqbal* and *Twombly*. *Id*. at 195-96.

Not only does the Fifth Count fail to allege a plausible claim for an ascertainable loss, suffered by Plaintiff, caused by Defendant, and remediable under CUTPA, the wholly conclusory "economic loss" referred to by the pleading seems inherently implausible. Plaintiff's principal grievance, stripped of rhetoric, is that Liberty Bank said to him: "We're going to close your accounts." There is no suggestion in the pleading that the bank coupled that unwelcome notice with an expression of intent to keep Plaintiff's funds which had been on deposit, or that the bank attempted to do so. For all that appears from the record, Plaintiff was free to retrieve his funds from the closed Liberty accounts and deposit them in another bank, or hide them under a mattress, or squander the money, unexpectedly at hand, on a pleasurable if ill-advised frolic.

We do not know what Plaintiff did with the funds Defendant returned to him against his will.

It does not matter. What does matter is that Plaintiff's proposed amended complaint fails entirely to allege a plausible CUTPA claim that the bank's conduct caused Plaintiff to suffer an ascertainable loss of the sort contemplated by the Act. The claim asserted in the proposed Fifth Count, if allowed by the Court to be included in an amended complaint, would inevitably be subject to dismissal under Rule 12(b)(6). For that reason, leave to amend the complaint to assert that claim will be denied.

This concludes the discussion of Plaintiff's state law claims. I now turn to his remaining federal claims.

## VI. FEDERAL CLAIMS

### A. Count Six: Violation of 42 U.S.C. § 1981

Count Six claims that, in closing Plaintiff's bank accounts, Defendant denied Plaintiff the same right to make and enforce contracts as a white citizen, in violation of 42 U.S.C. § 1981, a statute that states:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). To establish a § 1981 claim, a plaintiff must show: (1) that he is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) that the discrimination concerned one or more of the activities enumerated in § 1981. *Lauture v. Int'l Bus. Machs. Corp.*, 216 F.3d 258, 261 (2d Cir. 2000). As discussed *supra*, the pleading standard for this type of discrimination complaint is somewhat particularized: "The facts required by *Iqbal* to be alleged in the complaint . . . . need only give plausible support to a minimal inference of discriminatory motivation." *Littlejohn,* 795 F.3d at 311.

As to the first prong of a § 1981 claim, Plaintiff is a member of a racial minority, being of the African-American race. As to the third prong, § 1981 defines the scope of protected contract rights to include: "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Plaintiff and Defendant had a contractual relationship, as account holder and bank respectively, and Defendant's alleged discrimination concerned Plaintiff's ability to make and enforce that contract, one of the activities enumerated in § 1981. This satisfies the third prong.

As to the second prong, the intent to discriminate on the basis of race, Plaintiff alleges facts sufficient to meet the low bar to state a claim for discrimination under § 1981. This count provides alleged facts which give "plausible support to a minimal inference of discriminatory motivation." *Littlejohn*, 795 F. 3d at 311. The proposed Second Amended Complaint alleges that, on April 4, 2016, Defendant's employee inquired, by phone, into Plaintiff's country of origin and line of work. ¶17. Plaintiff later received a letter from Defendant's First Vice President, Robin Fujio, dated that very same day of April 4, informing him of Defendant's decision to close all of Plaintiff's accounts. Plaintiff Exhibit A, Doc. 4-1. This letter cited Defendant's difficulty in determining "the types of clients or the types of countries for which you contract with." ¶23, Plaintiff Exhibit A. Plaintiff further alleges that, during a subsequent telephone call, vice president Fujio told Plaintiff, "We don't want money from your type." ¶30. If Fujio made such a remark, in words or substance, to Nwachukwu, any surprise the Bank feels about being sued for discrimination should be less than total.[10]

_____

[10] It bears repeating that, at this initial stage of the litigation, the Court accepts as true the Plaintiff's factual allegations describing his conversations with Fujio. Whether Plaintiff can prove the accuracy of his account, after discovery, is a different question.

The Court is cognizant of this Circuit's admonition that, "[a]t the pleading stage, district courts would do well to remember this exceedingly low burden that discrimination plaintiffs face even after they have survived a motion to dismiss." *Dawson v. N.Y. City Transit Auth.*, 624 F. App'x 763, 770 (2d Cir. 2015). Based on Plaintiff's adequate showing as to the elements of a § 1981 discrimination claim, amendment of this count would not be futile, and leave to amend the complaint as to this count is therefore GRANTED.

**B.      Count Seven: Violation of 42 U.S.C. § 1982**

Count Seven is brought under the authority of 42 U.S.C. § 1982.  It claims that Defendant "has denied Plaintiff Nwachukwu the full and equal enjoyment of good [sic], services, privileges, advantages and on the basis of race." ¶ 67. § 1982 states in its entirety:  "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

A claim under § 1982 is analyzed much like one under § 1981, as discussed immediately *supra* under Count Six. To establish a § 1982 claim, a plaintiff must show: (1) that he is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) that the discrimination concerned one or more of the activities enumerated in § 1982. *See Puglisi v. Underhill Park Taxpayer Ass'n*, 947 F.Supp. 673, 700 (S.D.N.Y. 1996), *aff'd*, 125 F.3d 844 (2d Cir. 1997).

While the analysis of the first and second prongs of Plaintiff's § 1982 claim is identical to the that of his § 1981 claim, the third prong – whether the discrimination concerned an activity enumerated by § 1982 – deserves further consideration.  § 1982, like § 1981, is a codification of the Civil Rights Act of 1866, enacted in the wake of the Civil War to assure rights of citizenship to African Americans.  *See Runyon*, 427 U.S. at 167-74.  To fulfill the remedial purposes of § 1982,

the Supreme Court "has broadly construed this language to protect not merely the enforceability of property interests acquired by black citizens but also their right to acquire and use property on an equal basis with white citizens." *City of Memphis v. Greene*, 451 U.S. 100, 120 (1981). While § 1982 is most frequently asserted in relation to real property and housing discrimination, the rights it protects are not limited to interests in real property. *See id.* at 122 n. 35 (collecting lower court decisions). *See also Sims v. Order of United Commercial Travelers of Am.*, 343 F.Supp. 112, 115 (D. Mass. 1972) (denial of African-American plaintiffs' life insurance applications could amount to a deprivation of property rights under § 1982).

Given that historical and juridical background, a number of district courts have considered whether the *use* of a bank account is an independent property interest consisting of something more than the ownership of the funds deposited therein, the deprivation or impediment of which can establish a claim of racial discrimination under § 1982. These relatively few opinions have reached varying results. *Compare Life for Relief & Dev. v. Bank of Am., N.A.*, No. 12-cv-13550, 2015 WL 5729082 (E. D. Mich. Sept. 30, 2015) (granting summary judgment to defendants on § 1982 claim because closure of checking and savings accounts did not interfere with or impair any property interest) *with Jadama v. Keycorp*, No. 6-10-cv-1586, 2011 WL 2432931 (N.D.N.Y. June 14, 2011) (denying defendant's motion to dismiss a § 1982 claim where complained-of behavior was defendant bank's closure of plaintiffs' joint checking account); *and compare Watson v. Mahaffey,* No. c-08-59, 2008 WL 1740090, at *6 n.14 (S.D. Tex. Apr. 11, 2008) (commenting that defendants' freeze and subsequent remittance of funds from plaintiffs' bank accounts could not form the basis for a § 1982 claim because plaintiffs alleged no discrimination regarding purchase or rental of property), *aff'd*, 324 F. App'x 399 (5th Cir. 2009) *with Dobson v. Cent. Carolina Bank & Trust Co.*, 240 F. Supp. 2d 516, 524 (M.D.N.C. 2003) (plaintiff stated a claim under § 1982 where he alleged that defendants

40

interfered with his ability to make a bank deposit).

Of the cases examining this question, the facts of *Jadama* are most similar to those of the case at bar. There, the plaintiffs, an African-American husband of Gambian origin and an Asian wife of Indian origin, opened a joint checking account with defendant bank. 2011 WL 2432931, at *1. Their suit alleged that defendant's employee called plaintiff wife on two occasions, and told her that the account would be closed because her husband was a terrorist, and that the bank would not do business with plaintiffs because "they may be aiding and abetting terrorism or they may be conducting fraudulent activity, such as Nigerian scams." *Id.* at *3. Plaintiffs then received a fifty-dollar check by mail, representing the balance of their closed checking account. *Id.* at *1. Judge Hurd found that these facts sufficiently stated a claim under § 1982, so as to survive a motion to dismiss, because plaintiffs "put forth factual allegations plausibly suggesting that the decision to close their bank account was motivated by an intent to discriminate against them because of their race and/or national origin." *Id.*

Given § 1982's history of broad construction, and the similarity of the facts accepted as true in this case to the facts in *Jadama,* the Court concludes as a matter of law that the closure of Plaintiff's bank accounts impaired Plaintiff's "right to acquire and use property on an equal basis with white citizens" under § 1982. Adopting the analysis of the first and second prongs of the § 1981 claim considered above under Count Six, the Court accordingly holds that Plaintiff has met the low standard necessary to state a claim under § 1982. Since amending his complaint to assert this claim would not be futile, leave to amend in that regard will be GRANTED.

## C.      Federal Claims and the Question of Damages

For the foregoing reasons, the Court will grant Plaintiff leave to file an amended complaint

41

for the limited purposes of asserting claims against Liberty Bank under 42 U.S.C. §§ 1981 and 1982. It is necessary to add a note about damages recoverable by Plaintiff if he succeeds on those claims.

This Ruling denies Plaintiff leave to amend his complaint for the purpose of asserting certain state law claims because, *inter alia*, Plaintiff fails to allege the ascertainable money damages which are a requisite element under state law. That impediment does not arise with respect to these federal claims. If Plaintiff establishes the liability of Liberty Bank for having violated his constitutional rights underlying §§ 1981 and 1982, Plaintiff will be entitled to nominal damages of $1.00 on each count, even if he did not suffer and consequently cannot prove actual damages.

That is the holding of the Supreme Court's seminal decision in *Carey v. Piphus*, 435 U.S. 247 (1978). The case arose out of claims by students that a school board suspended them without procedural dues process. The Court granted certiorari "to consider whether, in an action under § 1983 for the deprivation of due process, a plaintiff must prove that he actually was injured by the deprivation before he may recover substantial 'nonpunitive' damages." 435 U.S. at 253. Having posed the question thus, the Court answered it in this manner:

> Because the right to procedural due process is "absolute" in the sense that it does not depend upon the merits of a claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed, we believe that the denial of due process should be actionable for nominal damages without proof of actual injury. We therefore hold that if, upon remand, the District Court determines that respondents' suspensions were justified, respondents nevertheless be entitled to recover nominal damages not to exceed one dollar from petitioners.

*Id*. at 266-67 (citations omitted).

The Supreme Court's holding in *Carey,* that nominal damages must be awarded for a constitutional violation even where actual damages are not proved, is uniformly followed by the

lower courts. *See, e.g., Amato v. City of Saratoga Springs, N. Y.,* 170 F.3d 311, 319 (2d Cir. 1999) ("*Carey* and its progeny are thus best viewed as clarifying that plaintiffs suffering constitutional violations can establish a plaintiff's liability through § 1983 even if an analogous state law tort would be dismissed for lack of compensability").

In the case at bar, the *Carey* rule would come into play if Plaintiff proves that Liberty Bank's conduct in closing his accounts violated constitutional rights grounded in the Equal Protection Clause, but cannot prove (as the present record indicates) that the violations caused him to suffer actual damages. In those circumstances, Plaintiff would recover nominal damages of $1.00 on each of Counts Six and Seven. These are actionable claims as a matter of law**.** Plaintiff will be granted leave to amend his complaint to plead them.

## VII.   CONCLUSION

In its brief in opposition to this motion to amend the complaint, Defendant cites two cases, *Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*, 559 F.3d 772 (8th Cir. 2009), and *Spadafore v. Gardner*, 330 F.3d 849 (6th Cir.2003) for the proposition that leave to amend should not be granted when the reason for that amendment is not clear. Doc. 32 at 4-5. The Court is not convinced that either of these cases has any bearing on the present matter. In *Pet Quarters*, no proposed amended complaint was filed, and no showing was made that an amendment complaint would state a viable claim. 559 F.3d at 782. In *Spadafore*, the plaintiffs offered to amend their complaint in their opposition to a motion for summary judgment, but failed to file a motion for leave to amend or submit any proposed amendment. 330 F.3d at 853. Neither is analogous to the present case, where Plaintiff has, admittedly after some procedural difficulty, presented a properly filed and argued motion for leave to amend, and a proposed Second Amended Complaint which contains two

43

claims that would survive a motion to dismiss.

For the foregoing reasons, Plaintiff's motion (Doc. 31) for leave to file a Proposed Second Amended Complaint is GRANTED IN PART AND DENIED IN PART.

The motion is GRANTED, in that Plaintiff is given leave to file an amended complaint which pleads the claims contained in Counts Six and Seven of the Proposed Amended Complaint.

The motion is DENIED, in that Plaintiff is refused leave to file an amended complaint which pleads any of the other claims contained in the Proposed Amended Complaint.

Defendant's Motion to Dismiss (Doc. 20), directed at the First Amended Complaint (Doc. 19), is DENIED AS MOOT.

Plaintiff is directed to file and serve a further amended complaint consistent with this Ruling on or before July 28, 2017. Defendant must answer that amended complaint within the time specified by the rules of procedure.

Because this Ruling restructures the litigation, all previously noticed pre-trial discovery is STAYED pending the Court's further Order. Any pending discovery motions, including Defendant's Motion for Protective Order (Doc. 37) are DENIED AS MOOT. Counsel are directed to confer and file a revised Rule 26(f) Report on or before August 18, 2017.


The foregoing is SO ORDERED.

Dated:   New Haven, Connecticut
            July 5, 2017


                                        /s/ Charles S. Haight, Jr.
                                        CHARLES S. HAIGHT, JR.
                                        Senior United States District Judge

44